FILED

2024 Aug-27  AM 10:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | | |
|---|---|---|
| **STUART BRIONES LOPEZ,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 6:23-cv-870-ACA** |
| | } | |
| **SOCIAL SECURITY** | } | |
| **ADMINISTRATION,** | } | |
| **COMMISSIONER,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Stuart Briones Lopez appeals the Social Security Commissioner's denial of his claim for disability insurance benefits and supplemental security income. (Doc. 1). Based on the court's review of the administrative record and the parties' briefs, the court **WILL VACATE AND REMAND** the Commissioner's decision.

## I.     PROCEDURAL HISTORY

In 2016, Mr. Lopez applied for disability insurance benefits and supplemental security income, alleging that his disability began on May 31, 2016. (*See* r. 15; *see also id.* at 176–78). The Social Security Administration initially denied Mr. Lopez's application and he requested review by an administrative law judge ("ALJ"). (R. 48–

70, 88, 91). After a hearing (*id.* at 29–45), the ALJ issued an unfavorable decision (*id.* at 15–22). The Appeals Council denied Mr. Lopez's request for review. (R. 1–3). A magistrate judge, exercising dispositive jurisdiction by consent, vacated the Commissioner's decision because the ALJ failed to give good reasons for rejecting the opinion of the claimant's treating physician. (*Id.* at 456–73).

While Mr. Lopez's appeal of the Commissioner's decision was pending, he filed another application for disability insurance benefits and supplemental security income. (*See* r. 494). On remand from this court, the Appeals Council consolidated the old and new applications and remanded the consolidated case to a new ALJ. (*Id.*). The ALJ then held three hearings (r. 370–85, 388–407, 410–34), before issuing an unfavorable decision (r. 349–59). Because the case had been remanded by the district court and by the Appeals Council, the ALJ's decision is "the final decision of the Commissioner." 20 C.F.R. § 404.984(a), (d); *id.* § 416.1484(a), (d); 42 U.S.C. § 405(g); *cf. Sims v. Apfel*, 530 U.S. 103, 106–07 (2000). Mr. Lopez therefore appealed directly to this court without requesting review by the Appeals Council. (Doc. 1 ¶ 5; *see also* doc. 6-2; doc. 15 at 2).

## II.   STANDARD OF REVIEW

The court's role in reviewing claims brought under the Social Security Act is a narrow one. The court "must determine whether the Commissioner's decision is supported by substantial evidence and based on proper legal standards." *Winschel v.*

*Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (quotation marks omitted). "Under the substantial evidence standard, this court will affirm the ALJ's decision if there exists such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015) (quotation marks omitted). The court may not "decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [ALJ]." *Winschel*, 631 F.3d at 1178 (quotation marks omitted). The court must affirm "[e]ven if the evidence preponderates against the Commissioner's findings." *Crawford v. Comm'r of Soc. Sec.,* 363 F.3d 1155, 1158–59 (11th Cir. 2004) (quotation marks omitted).

Despite the deferential standard of review, the court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Henry*, 802 F.3d at 1267 (quoting *MacGregor v. Bowen,* 786 F.2d 1050, 1053 (11th Cir. 1986)). The court must reverse the Commissioner's decision if the ALJ does not apply the correct legal standards. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th Cir. 1991).

To determine whether an individual is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of

Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

## III.    EVIDENCE AND ALJ'S DECISIONS

The court begins by describing the evidence submitted to the first ALJ, followed by the first ALJ's decision, the magistrate judge's decision, the evidence submitted to the second ALJ, and the second ALJ's decision.

Almost all of Mr. Lopez's medical records came from his treating physician, Dr. Nolan Hudson, whom Mr. Lopez regularly saw for back and neck pain, among other complaints. (*See, e.g.*, r. 251, 258, 272, 277–78, 280, 292, 300, 308, 313, 318, 324, 331, 333, 337, 340). Between April 2013 and September 2013, Mr. Lopez reported neck and back pain but had normal musculoskeletal examinations. (*Id.* at 272, 275, 280, 283). Dr. Hudson prescribed him Cyclobenzaprine, Mobic, and Lortab for the pain and recommended that Mr. Lopez see a neurosurgeon. (*Id.* at 277, 284).

In March 2014, Mr. Lopez indicated that his "[h]is job description is changed and he is not doing as much anymore" and that he continued "to have neck and back pain that is better." (*Id.* at 292; *see also id.* at 294, 296). In September 2014, Mr. Lopez complained of lower back pain and numbness and pain in his legs. (R.

305). A musculoskeletal examination showed pain with movement of the lower back. (*Id.* at 303). Dr. Hudson ordered an MRI of the lumbar (lower) back. (*Id.* at 305); *see* Lumbar, Stedman's Med. Dictionary (2014) ("Relating to . . . the part of the back and sides between the ribs and the pelvis.").

The MRI showed mild disc bulging at the L3-4 spinal segment; prominent disc bulging and "mild bilateral [degenerative disc disease] with mild central stenosis and moderate right and severe left neural foraminal stenosis" at the L4-5 spinal segment; and mild bilateral facet degenerative disc disease, with "[m]ild to moderate right foraminal stenosis" at the L5-S1 spinal segment. (R. 262). "Central stenosis" is a narrowing of the central canal of the spinal cord. Stenosis, Stedman's Med. Dictionary (2014); Central Canal, Stedman's Med. Dictionary (2014). "Foraminal stenosis" is a narrowing of the perforations in the spine. Foramen, Stedman's Med. Dictionary (2014). The radiologist concluded that Mr. Lopez had "[d]egenerative disc disease at L4-5 with mild spinal stenosis and moderate right and severe left foraminal stenosis." (R. 262). The radiologist also referred to a "[m]ild progression of findings" compared to a 2010 MRI that was not in the medical record before the ALJ. (*Id.*). Based on the 2014 MRI, Dr. Hudson offered Mr. Lopez "an epidural series or referral to neurosurgery." (*Id.* at 263). Mr. Lopez declined epidurals and stated he was "reluctant to see a neurosurgeon due to his previous experience" but he would "reflect on this." (*Id.*).

Beginning in April 2015, Mr. Lopez began reporting pain on a scale of one to ten. From April 2015 until August 2017, Mr. Lopez rated his pain from a five to a ten out of ten, with five being the most common rating. (R. 308, 313, 318, 324, 254, 258, 331, 333, 340). At every appointment, a musculoskeletal examination showed normal range of motion and normal gait, station, and movements, but pain with movement of the neck, back, or both. (*Id.* at 309, 313, 319, 324, 253, 332, 334, 337). And at every appointment, Dr. Hudson noted that Mr. Lopez's "current medication regimen and modalities" controlled his pain. (*Id.* at 308, 313, 318, 324, 258, 331, 333, 340). Mr. Lopez alleges his period of disability began during this period, in May 2016. (*Id.* at 177).

In March 2018, Dr. Hudson filled out a questionnaire indicating that Mr. Lopez would experience pain from his underlying medical condition because he has "significant degenerative changes in lumbar spine with some central canal stenosis (narrowing) and foraminal narrowing." (R. 343). He indicated that a job requiring Mr. Lopez to sit or stand for prolonged periods during an eight-hour workday would increase the level of pain, explaining that this was "due to disease." (*Id.*). He also indicated that maintaining "work posture (sitting, standing, and walking) for a total of eight hours during an 8 hour workday, without the opportunity to recline, would increase the level of pain [Mr. Lopez] experiences." (*Id.* at 343–44). Dr. Hudson further checked "yes" to the question whether the increased pain

"would cause serious distraction from job tasks and/or result in a failure to complete job tasks in a timely manner on more than an occasional basis during a typical workday and/or workweek." (*Id.* at 344). He stated that he believed Mr. Lopez's medical condition could reasonably be expected to cause his pain because Mr. Lopez has "severe back pain caused by underlying back problems." (R. 344). Finally, he indicated that he did not believe Mr. Lopez was malingering. (*Id.* at 345).

At a hearing before the first ALJ, Mr. Lopez testified that he does not have health insurance. (*Id.* at 32). He testified that on a good day, he could go outside and walk around the house, walk the dog, and burn trash. (*Id.* at 36). But even on good days, he had pain at a level of three to four out of ten and could sit for only one hour at a time. (R. 37, 39, 41–42). On bad days, he had to "alternate from getting in the hot tub to laying on the Lazy Boy, to going [to] the bed. And . . . put[ting] this Lidocaine lotion on my back and my shoulders." (*Id.* at 36). He spent three to five and a half hours reclining on a bad day and he had at least three bad days per week. (*Id.* at 37, 41). The medications kept the pain at around a five on bad days. (*Id.* at 42).

The first ALJ determined that Mr. Lopez had not engaged in substantial gainful activity since his alleged disability onset date of May 16, 2016; that his degenerative disc disease was a severe impairment; that he did not have any impairment or combination of impairments that met or medically equaled the

severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1;
and that he had the residual functional capacity to perform the full range of medium
work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c). (R. 17–21). In coming
to that conclusion, the ALJ found that the medical evidence showed normal gait and
station, movements, and range of motion; stable reports of back pain until 2015,
when Mr. Lopez's complaints of pain increased; unremarkable physical
examinations; mild to severe degenerative changes in the L4-5 region of the spine;
Mr. Lopez's refusal to undergo epidural injections and rejection of a referral to a
neurologist; and evidence that medication controlled his pain. (*Id.* at 19–20). The
ALJ gave little weight to Dr. Hudson's opinion because Mr. Lopez had never been
hospitalized, his physical examinations showed full range of motion and normal gait
and station, he was able to control his pain with medication, and he had received
"sporadic, routine, and conservative" treatments, without frequent medication
changes, emergency care, epidural injections, physical therapy, or chronic pain
management. (*Id.* at 20). In light of the residual functional capacity finding, the ALJ
found that Mr. Lopez was capable of performing his past relevant work and was
therefore not disabled. (*Id.* at 21).

The magistrate judge reversed and remanded. (R. 473). The magistrate judge
concluded that ALJ failed to provide good reasons for rejecting Dr. Hudson's
opinion because each of the reasons given was incomplete or inaccurate. (*Id.* at 463–

69). Contrary to the ALJ's assertion that Mr. Lopez received only conservative treatment, Dr. Hudson had recommended epidural injections or seeing a neurosurgeon, and Mr. Lopez declined those recommendations because he was afraid of needles,[1] had a previous bad experience with a neurosurgeon, and was uninsured. (*Id.* at 465–66). Similarly, contrary to the ALJ's finding that Mr. Lopez sought treatment sporadically, the medical records indicated that Mr. Lopez saw Dr. Hudson regularly. (*Id.* at 466). And although the ALJ found that Mr. Lopez's pain was controlled by medication, the medical notes indicated that his pain was controlled by *both* medication "and modalities," such as alternating between sitting in a hot tub, sitting in a recliner, and lying down. (R. 466–67). The ALJ relied on examination results showing normal movement, gait, and station, but failed to discuss results from the same examinations showing pain with movement of the back and neck. (*Id.* at 467). Finally, although the ALJ stated that Dr. Hudson failed to identify records supporting his opinion, Dr. Hudson provided comments about Mr. Lopez's degenerative changes, which Mr. Lopez's MRI results supported. (*Id.*).

The magistrate judge instructed the ALJ on remand to "reevaluate Dr. Hudson's opinions, specifically taking into consideration that, even if somewhat

---

[1] The medical record on which the magistrate judge relied to find that Mr. Lopez was scared of needles was a nurse's note stating that when she spoke with Mr. Lopez about epidural injections, he declined because he "does do well with needles." (R. 263; *see id.* at 465). It appears the magistrate judge assumed the nurse failed to type a "not" in that sentence. The Commissioner does not dispute the magistrate judge's reading of this medical note. (*See generally* doc. 15).

conservative in nature due to financial and other constraints, Lopez's treatment was hardly routine and sporadic, Lopez's pain was not controlled by medication alone, but required adherence to specific modalities, and that Lopez's MRI showed degenerative disc disease, which resulted in several abnormal physical findings." (*Id.* at 468).

On remand, Mr. Lopez presented some additional evidence, including the results of the 2010 MRI of his cervical (upper) spine. (R. 791); Cervical, Stedman's Med. Dictionary (2014) ("Relating to a neck . . . ."). That MRI showed that Mr. Lopez had multi-level degenerative changes in the C3-4, C4-5, C5-6, and C6-7 spinal segments with "foraminal stenosis, greatest on the right at C6-7 where it is moderate to severe in degree." (R. 791).

Mr. Lopez continued to see Dr. Hudson from November 2017 through February 2022. (*See id.* at 794, 854). During those appointments, Mr. Lopez rated his pain between a four and an eight and musculoskeletal examinations continued to show pain with movement of the neck, back, or both. (*Id.* at 794, 797, 810, 812–13, 821–22, 824–25, 829, 831–32, 834–35). Dr. Hudson's notes continued to make the same comment about Mr. Lopez's pain being "controlled on current medication regimen and modalities." (*Id.* at 794, 810, 812, 821, 824, 831).

In February 2021, Mr. Lopez went to an Afterhours Clinic complaining of neck and back pain. (R. at 837). X-rays of his upper spine showed cervical

spondylosis and X-rays of his lower spine showed lumbar spondylosis. (*Id*. 838). Spondylosis is stiffening or fixation of the vertebra, "often applied nonspecifically to any lesion of the spine of a degenerative nature." Spondylosis, Stedmans Med. Dictionary (2014); *see also* Ankylosis, Stedman's Med. Dictionary (2014).

Soon after, a neurologist examined Mr. Lopez and noted normal ambulation and gait and normal range of motion everywhere except Mr. Lopez's right shoulder. (R. 841–43). The neurologist assessed Mr. Lopez as having a history of cervical and lumbar disc disease with no evidence of cervical myelopathy or herniated disc and no evidence of muscle atrophy or trophic changes. (R. 844). Myelopathy is a "disorder of the spinal cord" and trophic changes are "changes resulting from interruption of nerve supply." Myelopathy, Stedman's Med. Dictionary (2014); Trophic Changes, Stedman's Med. Dictionary (2014).

In February 2022, Dr. Hudson referred Mr. Lopez to a physician at Gardendale Pain and Wellness. (R. 854). Mr. Lopez reported to that physician that at minimum his pain was at a four out of ten, at maximum the pain was at a nine, and on average his pain was at a five. (*Id.*). A physical examination showed full range of motion of the neck and a lack of pain with rotation of the upper spine. (*Id.* at 856). But the physician noted pain on palpation of the lower spine, limited flexion of the lower spine, and that flexion caused pain. (*Id.*). The physician ordered X-rays of the upper spine, lower spine, and thoracic back, stopped Mr. Lopez's prescription

of Norco because he had built up a tolerance, and started him on Percocet, Lyrica, and Baclofen. (R. 858–59).

A month later, another physician at Gardendale Pain and Wellness saw Mr. Lopez at a follow-up appointment. (*Id.* at 850). The physician noted no significant changes in the physical examination and that Mr. Lopez had not yet gotten the imaging ordered the previous month. (*Id.* at 851–52). Mr. Lopez reported that the new medications reduced his pain and increased his functional level. (*Id.* at 852–53).

In addition to medical evidence about his neck and back pain, Mr. Lopez presented a professional counselor's mental examination, in which Mr. Lopez reported feeling happy, being unable to cook or stand for very long, and having difficulty showering without his wife's assistance. (R. 800–03). The counselor diagnosed Mr. Lopez with unspecified anxiety disorder. (*Id.* at 802).

At several hearings on remand, Mr. Lopez testified before a new ALJ. (*See id.* at 370–85, 388–407, 410–34). He testified that he had gotten medical insurance in February 2022 (the same month he started going to Gardendale Pain and Wellness) and that the physician at Gardendale Pain and Wellness had recommended physical therapy and using a TENS 3000 pain relief unit. (*Id.* at 416–17). He testified that he continues to use hot baths and reclining to ease the pain, in addition to the "shock therapy" provided by the TENS 3000 unit. (R. 421).

The second ALJ issued a decision denying Mr. Lopez's applications for disability insurance benefits and supplemental security income. (*Id.* at 349–59). The ALJ found that Mr. Lopez's degenerative disc disease and unspecified anxiety disorder were severe impairments and that his impairment or combination of impairments did not meet or medically equal the severity of one of the listed impairments. (*Id.* at 352). The ALJ concluded that Mr. Lopez had the residual functional capacity to do light work, as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that he had to avoid "ladders/ropes/scaffolds and hazards such as unprotected heights and dangerous moving machinery" and he "should avoid public interaction and work with things instead of people." (*Id.* at 353).

In reaching that residual functional capacity, the ALJ continued to give little weight to Dr. Hudson's opinion. (R. 357). The second ALJ copied, in many parts verbatim, the first ALJ's rationales that Mr. Lopez had not been hospitalized, consistently took the same medications, had physical examinations revealing full range of motion and normal gait and station, and had indicated that medication controlled his pain. (*Compare id.* at 356 *with id.* at 20). The second ALJ also adopted the first ALJ's explanation that Dr. Hudson failed to identify records supporting his opinion. (*Compare id.* 356 *with id.* 20).

The second ALJ further explained his evaluation of Dr. Hudson's opinion by listing the medications Mr. Lopez was taking as of June 2022 (hydrocodone and a

muscle relaxer) and explaining that Mr. Lopez's treatment was routine and conservative; in 2022 a different provider had ordered physical therapy and prescribed different medications; Mr. Lopez had told a professional counselor he had "good sleep posture" and "a good mood"; Dr. Hudson's notes about Mr. Lopez were "sparse" and "contradictory" because on one occasion he noted a report of high levels of pain while stating that the pain was controlled; the neurologist's findings did not support the need for severe limitations; and the 2010 MRI of the upper spine revealed degenerative disc disease. (R. 356–57).

Based on the residual functional capacity the ALJ found, he concluded that Mr. Lopez could not perform past relevant work but that he could perform other jobs that existed in significant numbers in the national economy, including router, marker, and routing clerk. (*Id.* at 357–58). Accordingly, the ALJ determined that Mr. Lopez had not been under a disability as defined in the Social Security Act from May 31, 2016, through March 8, 2023. (*Id.* at 359).

## IV.   DISCUSSION

Mr. Lopez contends that the court should reverse and remand the Commissioner's decision because the ALJ failed to adequately consider the medical opinion evidence from Dr. Hudson. (Doc. 12 at 8–10). He argues that the second

ALJ violated the mandate of the previous district court decision in this case by copying the first ALJ's reasons for rejecting Dr. Hudson's opinion. (*Id.* at 11–21).

Because Mr. Lopez filed his application for disability insurance benefits and supplemental security income before March 27, 2017, when new regulations came into effect changing how ALJs could consider opinion evidence, the court must use the regulations and caselaw in effect under the old regulations. *See* 20 C.F.R. §§ 404.1527, 416.927. Under those regulations, an ALJ would "[g]enerally . . . give more weight to medical opinions from [a claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. §§ 404.1527, 416.927. Under Eleventh Circuit precedent about those regulations, "[t]he ALJ must give a treating physician's opinion substantial or considerable weight unless good cause is shown to the contrary." *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1259 (11th Cir. 2019) (quotation marks omitted). "Good cause exists when (1) the treating physician's opinion was not bolstered by the evidence, (2) the

evidence supported a contrary finding, or (3) the treating physician's opinion was conclusory or inconsistent with his or her own medical records." *Id.*

The court begins with the question whether the second ALJ violated the court's mandate. "The mandate rule is a specific application of the 'law of the case' doctrine which provides that subsequent courts are bound by any findings of fact or conclusions of law made by the court of appeals in a prior appeal of the same case." *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 881 F.3d 835, 843 (11th Cir. 2018). Although this court is not typically considered an appellate court, it is when reviewing the Commissioner's decisions. *See* 42 U.S.C. § 405(g) (permitting Social Security claimants to appeal the Commissioner's decision to a district court). And the Commissioner has not argued that the mandate rule or the law of the case doctrine does not apply in the Social Security context. (*See generally* doc. 15). Accordingly, the court will assume that it does.

"When an appellate court issues a clear and precise mandate, the [lower] court is obligated to follow the instruction. Neither the [lower] court nor any party is free to ignore the law of the case." *Winn-Dixie Stores, Inc.*, 881 F.3d at 843 (alteration omitted). A court "cannot amend, alter, or refuse to apply an appellate court's

mandate simply because . . . [it is] persuade[d] . . . that the decision giving rise to the mandate is wrong, misguided, or unjust." *Id.* at 844.

Here, the magistrate judge found that the first ALJ failed to provide good cause for giving little weight to Dr. Hudson's opinion because the record did not support the reasons given. (R. at 463–69). The magistrate judge explicitly rejected the first ALJ's determination that Mr. Lopez's conservative treatment history showed his lack of pain, pointing out that Dr. Hudson had recommended epidural injections and referral a neurosurgeon, but Mr. Lopez rejected those recommendations because of his fear of needles, bad experience with a neurosurgeon, and lack of medical insurance. (*Id.* at 465). The magistrate judge likewise rejected the ALJ's reliance on Mr. Lopez consistently taking the same medication because (1) Dr. Hudson actually noted that Mr. Lopez's medications *and* modalities (such as hot bathes and reclining for hours) controlled his pain; and (2) reports of "stable" pain do not detract from a claim that the person experiences pain. (*Id.* at 465–66). The magistrate judge rejected the ALJ's reliance on physical examinations showing normal gait and movement because the ALJ did not address the musculoskeletal examinations that consistently showed pain with movement of the lower back and neck. (*Id.* at 467). Finally, the magistrate judge disagreed with the ALJ's assessment of Dr. Hudson's opinion as "conclusory," stating that the medical notes supported the opinion and, although Dr. Hudson checked "yes" in

response to questions, he also provided comments explaining his response, and those comments were consistent with the 2014 MRI. (R. 467).

The magistrate judge, in remanding the case, provided express instructions for the ALJ to

> reevaluate Dr. Hudson's opinions, specifically taking into consideration that, even if somewhat conservative in nature due to financial and other constraints, Lopez's treatment was hardly routine and sporadic, Lopez's pain was not controlled by medication alone, but required adherence to specific modalities, and . . . Lopez's MRI showed degenerative disc disease, which resulted in abnormal physical findings.

(*Id.* at 468).

The second ALJ complied with one part of the magistrate judge's decision: the ALJ acknowledged that Mr. Lopez's treatment was not sporadic but was instead routine. (*Id.* at 356). But the ALJ did not address Dr. Hudson's repeated statements that Mr. Lopez's pain was controlled by medication *and* "modalities" (*i.e.*, hot baths and hours of reclining per day), nor did the ALJ address the abnormal physical findings from musculoskeletal examinations conducted by Dr. Hudson. (*See id.* at 356–57). Beyond the issues that the magistrate judge explicitly instructed the ALJ to consider, the second ALJ also failed to consider the magistrate judge's reliance

on the fact that Mr. Lopez rejected more extreme treatment because of his fear of needles, bad history with a neurosurgeon, and lack of insurance. (*See* r. 356–57).

The court is persuaded that, with respect to the evidence that had been before the first ALJ, the second ALJ failed to comply with the court's mandate in reevaluating the weight to give Dr. Hudson's opinion. *See Winn-Dixie Stores, Inc.*, 881 F.3d at 843–44. But the ALJ did consider whether Dr. Hudson's opinion was supported by post-appeal evidence Mr. Lopez submitted. (*See* r. 356–57). The court therefore turns to whether the ALJ offered good reasons, based on that evidence, for giving Dr. Hudson's opinion little weight.

The second ALJ's reasons based on the post-remand evidence also fail to show good cause for rejecting the opinion of a treating physician. *See Schink*, 935 F.3d at 1259. The ALJ noted that a new provider had ordered physical therapy and prescribed new medications but he did not explain how this detracted from Dr. Hudson's opinion about the effect of Mr. Lopez's pain on activities he would need to do at work. (R. 356). The ALJ also pointed to the neurologist's findings that Mr. Lopez had normal range of motion everywhere except one shoulder, but the ALJ did not acknowledge that another provider found Mr. Lopez displayed pain on palpation of the lower spine, limited flexion of the lower spine, and flexion caused him pain. (*See id.* 357; *see id.* at 841–42, 856). Nor did the ALJ explain why

Dr. Hudson's "sparse notes" consistently noting Mr. Lopez's pain level at a five warranted "affording this opinion little weight." (*Id.* at 357).

The ALJ did explain that, on one occasion, Mr. Lopez stated he was experiencing pain at a level of ten out of ten, yet Dr. Hudson continued to note that Mr. Lopez's pain was controlled, "which appears to be contradictory." (R. 357). But the ALJ did not explain why this single occasion of apparent contradiction warranted giving Dr. Hudson's opinion little weight overall. (*See id*.). Finally, the ALJ stated that the 2010 MRI of Mr. Lopez's upper spine showed degenerative disc disease well before Mr. Lopez's alleged disability onset date of May 31, 2016. (*Id.*). But he offered no explanation for why an MRI showing the existence of a degenerative disease six years before the disability onset date, combined with imaging from two years before the alleged onset date that showed increasing degeneration, plus post-alleged-onset imaging continuing to show the existence of disease, casts doubt on the treating physician's opinion about his patient's capabilities. (*Id.*; *see id.* at 262, 838).

In short, the court finds that the second ALJ violated the court's mandate in how he considered the evidence that had been presented to the first ALJ. In addition, the court finds that the second ALJ failed to provide good cause for rejecting

Dr. Hudson's opinion based on the evidence presented after remand. The court therefore **WILL VACATE** the Commissioner's decision.

Mr. Lopez asks that, because the ALJ violated the court's mandate and this case has been pending for years, the court remand with an order to begin paying benefits immediately. (Doc. 12 at 21–23). This appears to be relief that is within the court's power. *See* 42 U.S.C. § 405(g) ("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."). But this court is not convinced that ordering payment of benefits is appropriate at this point. Although the second ALJ violated the court's mandate and failed to provide good reasons for giving little weight to Dr. Hudson's opinion, the evidence is not so overwhelming that a finding of disability is a foregone conclusion. The court will instead remand so that the Commissioner can reevaluate Dr. Hudson's opinion using the proper standard and in compliance with the mandate that the court has now issued twice.

## V.    CONCLUSION

The court **WILL VACATE AND REMAND** the Commissioner's final decision. The court will enter a separate order consistent with this memorandum opinion.

**DONE** and **ORDERED** this August 27, 2024.

**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE